## DRESSER v. DRESSER.

No. 20646. Opinion Filed April 11, 1933.

Rehearing Denied June 13, 1933.

G. O. Spillers, for plaintiff in error.

Geo. S. Ramsey, Breckinridge & Bostick, Edgar A. deMeules, and Garrett Logan, for defendant in error.

SWINDALL, J. This is an appeal from an alimony judgment rendered on a petition filed October 31, 1928, subsequent to a divorce judgment of April 20, 1927, in which a purported award of alimony to the wife was later held void on the authority of Dutton v. Dutton, 97 Okla. 234, 223 P. 149, and Boulanger v. Boulanger, 127 Okla. 103, 260 P. 49, because not rendered for a definite sum, it having followed the language of an agreement of the defendant to pay plaintiff $1,000 a month, payable in amounts of $3,000 every three months, with no definite total amount or definite number of installments.

He paid $12,000 and refused to pay more, and, the alimony award having been held void, she proceeded by petition to recover reasonable alimony and obtained judgment for $125,000, from which he has appealed.

To avoid doubt as to a right to recover otherwise, she contended that fraud, not as to the divorce but as to alimony, brought her under the exception in section 509, C. O. S. 1921 [O. S. 1931, sec. 673], which provides that a divorce shall operate as a dissolution of the marriage as to both parties and shall be a bar to any claim of either in or to the property of the other, except in cases where actual fraud shall have been committed by or on behalf of

the successful party. She did not ask primarily to recover on the contract, but contended that because of fraud she could rescind the contract; she also contended that for mere breach she could rescind; and that upon rescission she would be remitted to the right possessed prior to making the contract. She prayed for such alimony as was equitable, and, that if jurisdiction to award it subsequent to the divorce judgment was denied by the court, then for damages on the contract. So, she claimed recovery on the contract only if on denial of jurisdiction to award alimony there would be no condition permitting an election, no choice of rights.

He denied jurisdiction to award alimony under section 509, supra. If there were no fraud, her contention on that point would fail.

Besides charging a fraudulent intent not to perform the contract, she charged fraudulent representations inducing it, as follows:

"Plaintiff alleges that defendant made representations to her and her counsel, upon which representations she relied in entering into said property settlement contract, that he had conditionally sold 400 shares of his stock in the Dresser Manufacturing Company of Bradford, Pennsylvania, and had only until the fall of 1927 to redeem it; that his other stock was all hypothecated with the Exchange National Bank of Tulsa, Oklahoma, to secure a loan of approximately $100,000; that he owed large sums of money to various creditors, and that the government had assessed him about $30,000 back income taxes; that the Dresser Manufacturing Company was a close corporation and that the stock had no market value, whereas she alleged the truth to be that he was at that time and is now the owner of 1,000 shares of said stock of approximately the value of $800 per share; that she did not know the value of said stock at the time she entered into said settlement agreement, but was led to believe by representatives of defendant that said stock did not exceed in value $300 a share; that defendant represented his financial condition to be so desperate that he was unable to pay his dues in the Tulsa Country Club and dues in other clubs to which he belonged and that he was not worth over and above his debts and liabilities more than $200,000, and she alleges that she relied upon these representations, which were false."

She also alleged that the home, title to which was in her, was mortgaged for $70,000, which was turned to and used by

him, and that while married she had loaned him sums aggregating $100,000. Before reviewing the evidence as to fraud, we observe that this mortgage yielded no money to be used by him, but was executed in the year 1922 to obtain the release of a mortgage executed in 1921 for $68,723.24 to the Exchange Trust Company of Tulsa, Okla., as trustee for various creditors who in 1920 had sold furnishings for the home, the trust mortgage having listed the accounts by names of creditors and amounts of their respective accounts. As to the alleged loans aggregating $100,000, she was credited on his books with $54,000, but most of that came from the sale of some stock which he gave her in 1919 and was sold in 1919 and went directly or indirectly into the building and furnishing of the home. The house and furnishings cost over $342,000, and all but the amount secured by the trust mortgage and $13,500 borrowed and paid by her for part of the lots was paid by the defendant, so that any of her money used by him was many times made up by what he put into the home, and the alleged loans were merely inconsequential matters of bookkeeping.

They were married in 1916, he being 25 years old, the son of wealthy parents, and worth over $1,000,000, among his assets being some Dresser Manufacturing Company stock upon which this litigation principally turns. That was a close corporation, and the stock was held in the family. She was 26 years of age, but in both marital and financial experience was much older than he, having been married and divorced, then facing the world with one child six years, and one three years, of age, with a total financial worth, according to her own testimony, of about $15,000, principally the proceeds, over attorney's fees, of $23,000 alimony. He owned a gas company and a torpedo company, but later sold them. About two years after marriage they moved to Tulsa, Okla., and he was reported in 1919 and 1920 as worth $2,000,000, largely speculative, paper value of oil leases, although he did have considerable production. In 1919 and 1920 and subsequently he spent about $750,000 in drilling many dry wildcat wells, but much of that was paid from production, of which he once had considerable, and much was met from the proceeds of the sale of leases around the drilling sites. That did not put him on the verge of bankruptcy and in the terribly em-

barrassing condition existing at the time of the divorce. That condition was due to expenditures for living expenses, which ran about $100,000 a year, and which she refused to appreciably reduce. His stock in the Dresser Manufacturing Company in 1925 and 1926 paid about $60,000 in dividends each year, and in 1927 about $70,000.

Both liked high living, but the following indicates their attitudes as to exorbitant expenses when they became dangerous:

"Q. You knew he had some stock there. Did he get any dividends on that stock? A. Oh, yes, of course. We lived on it. Q. You lived on that? A. Yes. Q. How much did the dividends amount to, if you recall? A. Well, as I remember it, they were extra dividends and the regular dividends at that time I imagine amounted to about sixty or seventy thousand dollars a year."

She meant that the dividends were used for living expenses, but not that they were sufficient to pay those actually incurred.

"Q. Mrs. Dresser, I will ask you if it is not a fact that during the married life of yourself and Mr. Dresser he gave you approximately a million dollars expenses? A. In what form, Mr. Spillers? Q. From time to time, if he did not give you in the neighborhood of a million dollars to spend during the time that you and he were married? A. I don't think our living in any year exceeded $100,000. Q. Your living did not exceed $100,000 a year? A. Yes, sir. Q. How long were you married? A. Eleven years, but of course he participated in that living."

And as to the item of money paid for her clothing alone, the following appears:

"A. I was dressed and clothed very well. Q. Would you say $10,000 a year? A. I think perhaps it might be over and it might be under. Q. Would you say approximately $10,000 a year? A. I think perhaps you might be safe in saying that."

And in the argument on the defendant's demurrer to the plaintiff's evidence, Mr. Ramsey, of counsel for plaintiff, argued:

"They lived at a standard of practically one hundred thousand dollars a year for living expenses. * * * Here is a man and woman who had lived on practically $100,000 a year for ten years."

As to deciding what amount of the defendant's money would be so spent, and unwillingness to retrench, the following appears:

"Q. During the time that you and Mr. Dresser were married, isn't it a fact that both he and Mr. Atkins remonstrated with you about the expense accounts, and both Mr. Atkins and Mr. Dresser told you from time to time that you were spending entirely too much money and that you were exceeding Mr. Dresser's income every year by a considerable sum? A. The last two years, Mr. Spillers, I believe I was very conscientious about expenditures incurred for clothing, as probably the books will show. We had to keep the house going. I reduced the number of servants. I was quite willing to be fair as I could. I could not see any reduction—terrific reduction, cause for it. I knew he was contracting for leases and getting wildcat wells, and I was sorry."

He did not desire to keep the home. She did not deny that in 1925 he wanted to sell it to meet his debts, and that she refused, so that he had to sell 493 shares of his stock at $350 per share, with an option to repurchase it at $400. Further, on April 20, 1927, his other 1,000 shares, his only asset of value, were pledged to the Exchange Trust Company of Tulsa, Okla., for a debt of $79,500. Also, not including a claim for back income taxes, he owed other creditors about $50,000. The income tax claim had been about $87,000, but was finally settled for $34,000. He was obligated for heavy attorney's fees in the tax matter. And he was behind in his dues at the Tulsa Country Club, and could not afford to pay them with any such needed money falling into his hands. His bank balance April 20, 1927, was not shown, but on April 30th, it was about $1,400.

So, all that he asserted which was matter of fact was true. She knew of the tax claim, of the stock sale, and of the pledge of the 1,000 shares, and her attorney ascertained the amount of the loan; and she admitted that the reason she did not know the amount without inquiry was just because it fluctuated. She asserted that she could see no reason for drastic reduction in living expenses, even in the face of the stale mortgage for furnishings bought back in 1920, the sale of the stock, the tax claim, and the pledge of the 1,000 shares of stock. She owed $27,400, a balance on a debt of $42,000. While she said that she loaned that money to the defendant, she would not say definitely how much of it, and it clearly was not much, for her briefs state that the proceeds of the stock sales in 1919 made up all but about $10,000 of the $54,000 with which she was credited, so that of the $42,000 that she borrowed, apparently if he

got any it was not more than $10,000, and he evidently reduced the loan from $42,000 to the $27,400 for her. Also, she got something like $9,000 by selling three pieces of jewelry which came to him from his mother's estate and which he had given her. These transactions were not immediately preceding the divorce, the loan of $42,500 having been made by the Bradford bank and transferred to the Tulsa bank, and the jewelry sale having been several years before this last trial. His attorney severely criticizes her for selling the jewelry without the defendant's knowledge or consent, but it does not appear from the evidence that there was any sentiment surrounding the possession of it, so we are not disposed to criticize her from that viewpoint. But the bank loan and the sale further evidence her spending proclivities.

Simple computation would have shown the amount of the $50,000 of unsecured debts, for she knew every other item, and that his statement that if he would pay his debts and turn over all that he had to her, or keep what was left, it would not exceed $200,000, was based on a necessity of selling on Mr. Breckenridge's demand for from $150,000 to $200,000, and any man would have so understood it in the light of the context, for he carefully pointed out that the stock was not listed and had no market value, and that the corporation was a close corporation into which an outsider would not buy. Further, in the same negotiations he spoke of the stock sold at $350 with an option to repurchase it at $400, and said that he didn't know whether he would be able to get it back, for he did not know where he could get the money, clearly indicating that he considered the stock worth $400 as an investment, with no more definite expression as to investment value. Mr. Breckenridge knew of the company and understood that the stock was valuable. They were as well qualified to judge of investment value as he was, for we are satisfied that there was nothing bearing upon it which she did not know. She knew all about the stock. It had been the source, not the only source, but the chief source, of their expensive bread and butter, and the other things costing $100,000 a year. She and her counsel had the alimony matter in mind for about three months, for when Mr. Breckenridge first took up the matter with him, Mr. Dresser did not desire her to divorce him and asked that she consider the matter for about three months, and that caused a delay of about that period of time. She was a very intelligent woman aside from inability to exercise sense in spending money. She knew what the stock given her by her mother was worth when given and at the time of the divorce. She had dealt considerably in stocks, making nothing with the possible exception of some spending money, but nevertheless she had bought and sold them. She had borrowed from banks. She knew that the $68,723.24 mortgage was an 8 per cent. mortgage, and that the $70,000 mortgage was a 7 per cent. mortgage. She could tell the cost of stock given to her by the defendant from time to time, whether she made a profit or loss on it, and just about what it sold for. He said that she knew all about his business right up to the end. She said that during the last few years she did not. But she admitted that both he and Mr. Atkins complained from time to time, and we have no doubt that these complaints were definite. She not only knew of the sale and of the pledge, but she knew about dividends, and there is no doubt that she knew of the reserves out of net profits which went into the company's surplus. She admitted knowing everything else about the stock, and in the face of his declaration that she knew all about his business, she did not deny knowing that about the stock.

The defendant was very frank with Mr. Breckenridge. We think he did not consider that he could sell the stock for over $300. The book value at the end of 1926 was $338 a share. Her own witness, Mr. Atkins, a former bookkeeper for both, said that for a minority interest in a close corporation, stock having no established exchange or curb value, one could only get book value plus selling power, and prior to that he had said that nobody would buy into the company and take the minority interest, which would point to a sale below book value.

They knowing all of the facts as to sale and investment value, there was no fraud. The trial court did not find that he misrepresented any fact, but held that he had concealed the fact that the stock was very valuable. She knew the facts and had the aid of counsel with years of experience at the bar and on the bench. That finding was against the great weight of the evidence.

As to fraudulent intention not to perform, the trial court found no such intention, but this is urged in the brief, with the claim

that the best evidence of intent not to perform is a breach, which is language appearing in some of the cases. That is unsound. Most promises are made with an intent to perform. Most broken ones are broken because of inability or subsequently formed intent not to perform. The breach is in itself neutral, and the fraudulent intent must be shown by color of the other circumstances. The evidence here indicated a recently formed intent. He had paid for a year, and when he refused to pay further he was excited and said that he did not see why she should be able to live better than he. There was no evidence of fraud, either as to that intent or as to representations made. So, the applicability of section 509 [673], supra, is moot.

But we held in Oder v. Oder, 149 Okla. 63, 299 P. 202, that where an alimony judgment was void for failure to award a definite amount, there was jurisdiction to proceed and award alimony upon the divorce petition. Since there may be cases pending which involve the correctness of that decision, we merely assume for the purposes of this case that the opinion is sound. She cited it in a supplemental brief and urged that it sustained her position, and her petition prayed that if necessary it be considered as filed in the divorce action. Under that decision fraud would be immaterial, and this necessitates considering what, if anything, would have been equitable as alimony at the date of the divorce judgment.

Before attempting to consider the matter of the stock, we may consider what factors are involved in determining as to property division and allowance of alimony, then, after ascertaining that, we shall consider the worth of the parties without regard to the matter of the stock. Then we may consider how the stock affects the problem and reach a conclusion. We do this because it will appear that there are equities to be taken into account with regard to the stock.

The plaintiff's briefs gave little attention to indicating what factors are involved in the problem of dividing property and allowing alimony. She asserted:

"As a general rule the amount of the allowance of permanent alimony varies from one-third to one-half of the husband's estate, it being said in some cases that it is improper under any circumstances to give her less than what her dower interest would

have been for the reason that he should not be allowed to profit by his own wrong."

Manifestly the word "alimony" was used by her in its broadest sense, as including a division of the property of the husband as well as an allowance for support. References to fractional allowances arose in the early cases of judicial separation only and the allowance was from income alone, but they persist to some extent in the modern opinions in cases of absolute divorce and division of property. However, the courts almost always carefully say, when not bound by the terms of a statute requiring allowance of a certain interest, that there is no fixed rule, and that each case depends upon its own facts and equities. There is no problem in fractions, and oftentime both allowances are much less than one-third. In the old cases it ran from half of the income down to a third and even below that; one-half of income was allowed only in very exceptional cases, as where most of the property came from the wife, or the income was so small that so much was reasonably required. In Smith v. Smith (1814) 2 Phillim. 234, 161 Eng. Rep. (Full Reprint) 1130, Sir John Nicholl said: "She is the injured party, and has a strong claim upon the court; though with respect to the quantum there is no established proportion of the joint stock; each case must depend on its own particular circumstances, no two cases are exactly alike." The whole fortune came from the wife—it had been settled on her and he had induced her to convey it to him. He had been adulterous and cruel. Income was two thousand pounds annually, and the wife was allowed one-half. In Cooke v. Cooke (1812) 2 Phillim. 40, 161 Eng. Rep. (Full Reprint) 1072, under like circumstances, where the property brought by the wife earned an income of more than eight hundred pounds annually, after deducting the property tax and other items and accepting the husband's figures, she was allowed four hundred and fifty pounds, about half, in addition to an income on other property of her own, bringing her income to six hundred and thirty pounds a year. In Deane v. Deane (1858) 1 Sw. & Tr. 90, 93, 164 Eng. Rep. (Full Reprint) 642, the husband's annual income was one hundred and sixty-four pounds and there were eight children, none of whom were with him. The Judge Ordinary allowed the wife eighty pounds per annum. In Burr v. Burr, 10 Paige (N. Y.) 20, the husband was worth over $1,000,000, with

an income between $30,000 and $60,000 annually. He had been extremely cruel to the wife for years. She was allowed $10,000 a year, less than a reasonable third, more properly considered a sixth, and many cases of allowance of much less than a third of income may be found.

The plaintiff cites a judicial separation case, Andreas v. Andreas (N. J. Eq.) 102 Atl. 259. His real estate was found to be worth $103,000, but he said he would sell it for $71,000; his personal property at 4 per cent. and 3½ per cent. yielded an annual income of $5,693, and to that income the judge added 5 per cent. on the $71,000 to reach a sort of income capacity, making a total of $9,243, and allowed the wife $3,200 for herself and for support of the minor child. The court said that while there was no general rule, usually alimony was one-third, not including allowance for support of child. Hers probably ran some less, if we allow for support of the child. The court's statement that usually one-third was allowed was in a case where many circumstances and equities affecting the question were not present. The income was small. There was no division of property. The result of our investigations with regard to fractional allowances are hereinafter shown.

But modern statutes provide for division of property, and for allowance of alimony in gross (which is in effect a property division) as well as by installments, and the rights of spouses are radically different than they were in the early law. Originally divorce destroyed inchoate dower, and the wife was neither an heir nor a distributee, and even her paraphernal property was liable to the demands of creditors, if required. Statutes where dower exists have not only preserved her right to it, especially where the divorce is granted to her, but also provide for allowing it at the time of divorce, or its equivalent. Also, under modern law she is often a statutory heir instead of being merely entitled to dower, and she is a distributee of his personal estate. But it does not follow that, although besides these modifications in the laws of descent and distribution there are also divorce statutes permitting division of the estate and allowance of alimony in gross as well as out of income, in case of divorce we should distribute the estate as though the husband were actually dead. Still each case depends upon its own circumstances and equities, and while courts sometimes express themselves in terms of fractions, they still always accompany these declarations by statements that there is no legal rule and that the circumstances and the equities control. We have not found that out of a large estate where the property did not principally come from the wife or she was not chiefly responsible for the accumulations, she is allowed as much as one-half, or more than one-third, and often she is allowed much less than that, even where blameless and by her co-operation in economy and frugality aiding the husband to that extent in his accumulations; and if the property is the separate estate of the husband owned before marriage or coming to him by gift, devise, or descent during marriage, or increased value of such property or earnings from it, the division and allowance often run much below one-third. Further, the conduct of the parties is a circumstance to be given much weight, as well as the duration of married life and evidence or affection or lack of it, as is their conduct as to economy or profligacy.

The plaintiff also cited two other cases, Muir v. Muir, 28 Ky. Law Rep. 1355, 4 L. R. A. (N.S.) 909, 92 S. W. 314; and Brett v. Brett (Iowa) 182 N. W. 245. In the Muir Case the parties were married about eight years and were 28 years of age. He had infected her with syphilis, and one of the two children showed taints of it. His net worth was at least $15,000. She was allowed $5,000, the case being remanded for entry of judgment for that amount. The appellate court said that there was no fixed standard. She was allowed less than one-third and had two children to support. In the Brett Case the parties had been married over seven years. When married he was worth $60,000, but his debts were not shown. At the time of the divorce he was worth net at least $375,000. She was allowed $100,000. Both parties appealed. She was an industrious, hard-working woman, and a good housekeeper, and during part of the married life had run a 24-room rooming house, doing her own housework and washing, or most of it. He was brutal to her, and was an adulterer. Once during the married life he was sued for alienation of affections, and she was of material assistance in the defense, and she was also of material assistance in aiding him in setting aside a trust settlement by which he derived most of his wealth, the trust having been in the nature of a spendthrift trust because of his profligacy. The

100

judge who wrote the opinion would have increased the allowance to one-third, $125,000, for which she asked, but the majority refused to increase it. The opinion was largely devoted to reciting. the contentions of the parties and listing their citations, without review of them or comment upon them, with the exception of commenting on Closz v. Closz (Iowa) 169 N. W. 183 where an allowance of about one-half had been reduced to less than one-third, dismissing that by the statement that it did not appear how long the parties had been married. From the opinion in the Closz Case it would appear that the parties had been married for some time, for the court commented on the fact that she had not been above the average aid of a wife in assisting in accumulating property, and other statements indicate it. Further, in the opinion in the Closz Case reference was made to Barr v. Barr, 157 Iowa, 153, 138 N. W. 379, as indicating that if the net value of the property was but $15,000, an allowance of $5,000 would be excessive, and to Arment v. Arment, 154 Iowa, 573, 134 N. W. 616, where plaintiff was given custody of two minor children, the husband was worth from $20,000 to $30,000, and in addition to $500 temporary alimony the trial court had allowed $7,500 permanent alimony, which the appellate court reduced to $5,000; and reference was made to other Iowa cases of the same import. Manifestly the majority of the court took a different view of the Iowa law than the judge who wrote the opinion in the Brett Case. In answering the contention that the wife had not helped accumulate the property, the judge said: "Neither did he, for to inherit it from the father did not require special ability or effort." He had already commented on the aid that she had given him in setting aside the trust settlement; but anyway, if he meant that the husband's ownership of separate property was not a factor to be weighed in his favor, his declaration was in conflict with all of the cases.

Often in a normal case less than one-third is awarded. Many circumstances present in the instant case are given considerable weight in allowing less than would be allowed to a wife who had been an average wife, but brought no property and did not materially aid in accumulating it.

In Hooe v. Hooe (Ky.) 92 S. W. 317, another case where the husband had in-

fected the wife with syphilis, he was worth $13,000 and she was allowed only $3,000, less than one-fourth.

In Pemberton v. Pemberton (Ky.) 184 S. W. 379, out of a net worth of $22,000, with an expectancy of equal if not greater value, the plaintiff was awarded less than one-fourth of what he actually owned. That was on his appeal, but it indicates the attitude of trial courts.

In Hooper v. Hooper (Wis.) 78 N. W. 753, the husband was worth $80,000, yielding $4,200 annually, and made considerable from his profession. They had been married over 20 years and had a high social standing. There were no palliating circumstances. An allowance of $7,000 in gross and $100 a month, less than one-seventh of his estate, and less than one-seventh of his income, was affirmed on his appeal.

In Rosenberger v. Rosenberger (Ky.) 150 S. W. 1023, the husband was worth from $15,000 to $18,000. The chancellor allowed $2,000, with no other property or payments. There was some question as to the wife's purity. The appellate court said: "We, at any rate, are satisfied that the chancellor should have adjudged her no more; and likewise, that he probably should not have adjudged her less." Decree awarded for his fault.

In Newsome v. Newsome (Ky.) 25 S. W. 878, the husband obtained the divorce. He was worth $20,000, and the wife $3,000. An annual allowance of $400 was held excessive and was reduced to $1,000 in gross. In addition to his property he had an income of from $1,000 to $3,000 annually.

In Von Glahm v. Von Glahm, 46 Ill. 134, he was worth about $100,000, and the court decreed $20,000 in money and real estate worth $10,000. It was conceded that alimony in gross could be awarded, but the court said that was not a proper case for it. It said: "The estate of the defendant had been accumulated before his marriage. Her claim, therefore, to an absolute partition of it is by no means the same, in an equitable point of view, that it would be if the property were the product of the joint labors and economies of the parties during their married life. Neither did the wife bring property to the husband upon her marriage." Reversed.

In Drake v. Drake (S. D.) 131 N. W.

294, the parties were married in 1871 and separated in 1905. She gave him $2,700 which he used in accumulating his property. His real estate was worth $15,000, and, deducting his debts, his net worth was $12,600. Each was awarded custody of one minor child. This was considered equal to half of his estate, as the $6,300 would have required a forced, sacrifice sale of his land. Analyzing this, we find that out of a net worth of $12,600, deducting the $2,700 which she let him have, without interest, left a net worth of $9,800, so above the money returned to her she got only $2,300 out of the net worth of $9,800 notwithstanding that her $2,700 was an important factor in the accumulation of all that he had and he had used it for years.

In Bearinger v. Bearinger (Mich.) 136 N. W. 1117, the decree was for the husband, but required payment of alimony. His farm was inherited from his parents, and in 1905 when he was heavily in debt he got $5,000 from his brother's estate, with which he paid his debts and improved his farm. Deducting that $5,000 from his worth at the time of the divorce, he would not have much. Her conduct had been questionable. On appeal $600 was held not inadequate.

In Bialy v. Bialy (Mich.) 133 N. W. 496, the decree was for the wife. They were married in 1877, he being worth $1,400, and working in a store with a weekly income of about $20. She inherited from various sources about $3,800, and let him have some of it to put in his business, and they mortgaged the home for money used for the same purpose. At the time of the divorce, she was worth from $3,000 to $4,000 and he was worth $350,000, consisting of a prosperous hardware business evidently bringing in a good income, some real estate, stocks, bonds, and other assets. Her conduct had been above criticism. She appealed from an award of $100,000. The appellate court said: "A basis of one-half or even more might be just and equitable in a case where a large proportion of the property came from the wife, or her business ability and special efforts were largely instrumental in securing it. * * * I do not believe that the contribution to the capital of the two by the wife has been a material factor in the accumulation of this fortune." The $100,000 was less than two-sevenths of his estate. It is as large a sustained award as we have found in the cases.

And where the parties were married only a short time, not only where both were at fault, and where it was a marriage of convenience or bore such evidence, but also where the wife was not at all at fault, the allowances have been radically below one-third.

In Hermann v. Hermann (Wis.) 129 N. W. 398, the parties had lived together two years. Proof of cruelty was clear, but she was afflicted with goiter and was nervous and irritable. His estate was worth from $25,000 to $30,000, and his annual income was $1,600 to $1,700. He appealed from an allowance of $3,500 in gross. The appellate court affirmed it, saying that under all the circumstances they could not consider it too high.

In Mason v. Mason (Mo. App.) 233 S. W. 263, the wife got the divorce after married life of five months. She had been previously divorced and had two children. She did not help accumulate anything. The trial court allowed her $750. He was worth $10,000. The appellate court said: "While the wife, on being awarded a decree of divorce, is entitled to a fair allowance for alimony, considering the ability of the husband to pay and the station in life of the parties, yet the court should be careful * * * to leave no ground for encouragement to the adventuress who might seek to use the divorce courts as a means by which to enrich herself. We do not say that was attempted in this case, but we are of the opinion that, taking all the circumstances and the financial conditions of the parties into consideration, alimony in gross in the sum of $500 would fully meet the ends of justice in this case." In Bruhn v. Bruhn (Wis.) 222 N. W. 242, the parties lived together fourteen months. He was a widower with one child. She had been employed in responsible positions and had property worth from $15,000 to $20,000 with an annual income of $1,000 from it. He was worth in real and personal property about $103,184.20, with an annual income of from $9,000 to $10,000. He got the decree and the Supreme Court considered, therefore, that she was more to blame than he. Alimony of $16,306.63, one-sixth of his estate, was cut to $5,000, less than one-twentieth of his estate, disregarding his annual income of between $9,000 and $10,000. The court said: "No absolute measuring stick is possible for the adjusting of such matters, but we deem that an allowance of more than $5,000 to her from the plaintiff's property would be an unjust enrichment as the result to her who is found

responsible for the untoward ending of this joint speculation in matrimony."

In Steinbach v. Steinbach (Wis.) 227 N. W. 879, there was no gross ill treatment, and such as there was was not without provocation. They lived together two years; she had been married once before and he twice. She had $700 out of $1,000 alimony obtained from a former husband; he was worth $19,266 above his debts, but some of it was not well secured and he was a surety on a $2,000 note which he might have to pay. The trial court allowed the wife $3,000. The appellate court reduced it, saying: "No definite rule can be laid down to guide trial courts in dividing the husband's estate between the parties on final division upon the granting of a divorce. The learned trial judge seems to have assumed that the wife is always entitled to some definite proportion, and that under the circumstances here involved she should receive at least one-sixth. This is an erroneous conception. The division is not a problem in fractions. In every case all the circumstances must be considered, including the separate estate of the wife. The question always is: What should the wife receive, under the circumstances, in view of what she already has and what will remain to the husband after division? * * * However, in view of the special facts that the parties had lived together so short a time, that the wife did not at all assist in the accumulation of the husband's property, that she had some property of her own, and all the circumstances, we consider that $1,500 is a sufficient allowance in this case."

In Harrison v. Harrison et al. (Mich.) 13 N. W. 581, and Stevens v. Stevens (Mich.) 13 N. W. 835, the husband had already transferred to the wife, in one case property fully equal to what she should have, and in the other not greatly disproportionate to what she should have had, and a denial of any allowance was sustained in each case.

In Herold v. Herold (Mich.) 230 N. W. 913, the plaintiff, 27, lived four years with the defendant, 53 years of age. She was entirely blameless and had not only been faithful, but had worked hard. She had no mercenary motive. She had worked on the farm, pitched hay, dug potatoes, and with the exception of plowing had done the work of a hired man. She had helped in building the house. She also did her own housework. They had no children, but she testified to two miscarriages caused by heavy work while she was pregnant, and that she was in poor health at the time of the trial. Being desirous of leaving the farm, he, through her influence and possibly her persuasion, had traded his larger farm and some personal property for an equity in Chicago real estate, which was lost. This apparently caused trouble between them. The trial judge awarded her divorce, but held that she was responsible for the financial losses. The appellate court said: "The judge in his opinion stated that plaintiff was the cause of defendant's losing a good part of his property. The record does not show that plaintiff should be held responsible for this loss. From the manner in which both plaintiff and defendant worked it was highly desirable that they improve their condition. They wanted to leave the farm. The fact that they made a bad business deal is no reason why plaintiff should be penalized." Undoubtedly, if she had been blameworthy, in regard to the loss, the appellate court would have approved considering it against her.

And in Weidert v. Weidert (Wash.) 180 P. 135, we have a case where the fact that money was spent on the wife was considered against her in the allowance, and though the marriage lasted eleven years, as in the present case, it was still considered as a marriage of convenience. He admitted that he was worth $25,000, and the trial court allowed her $6,000 and $250 attorney's fees. The appellate court said: "When the parties were married * * * each had matrimonial experience. Plaintiff had certainly about $900, and possibly $1,500. Whatever the amount may have been she retained it as her own. * * * Defendant is worth more than when married, but his added worth comes from the increased value of his lands. The parties traveled much in search of health, and a considerable sum was spent for the benefit of plaintiff—defendant says about $6,000, but without a showing of all the items. It is certain, however, that a substantial aggregate sum was dispensed. * * * Plaintiff brought nothing to the marriage state—neither health, nor property. There is nothing in the habit, conduct, or the lives of the parties to call for an admeasurement of equities. There never was a heart or a true emotion in the union, and in its dissolution we feel that the court should meet the situation in the impassiveness that moved the parties when they entered into the marriage state in which they

have walked during the eleven years of their disastrous adventure. Were the question entirely original, we would not be so liberally inclined as was the trial judge, or as we have decided to be, having due regard and esteem for his opinion. With this feeling then we have concluded that plaintiff should have no more than $5,000 including the $250 allowed for attorney's fees."

And under our decisions, even in allotting from what is technically termed joint accumulations, property accumulated during the marriage not coming by gift, devise, or descent, an equal division is not required, but full play is allowed to equities, and in making the allotment the court may not only consider whose efforts principally caused the accumulation, but even as to that class of property may consider withdrawals from the common fund. In Tobin v. Tobin, 89 Okla. 12, 213 P. 884, it was said: "Measured by these rules, and under these circumstances, we are of the opinion that the trial court made a division of the jointly acquired property by charging the large amounts received by her against her interest therein, which indeed were more than the net value of the properties now owned." She was allotted none of the property. She was allowed $50 a month alimony, but the court commented on the fact that that allowance originated in a suggestion of the husband's attorney.

The section of our statutes dealing with division of property and allowance of alimony is section 508, C. O. S. 1921 [O. S. 1931, sec 672], which reads as follows:

"When a divorce shall be granted by reason of the fault or aggression of the husband, the wife shall be restored to her maiden name if she so desires, and also to all property, lands, tenements, hereditaments owned by her before marriage, or acquired by her in her own right after such marriage, and not previously disposed of, and shall be allowed such alimony out of the husband's real and personal property as the court shall think reasonable, having due regard to the value of his real and personal estate at the time of said divorce; which alimony may be allowed to her in real or personal property, or both, or by decreeing to her such sum of money, payable either in gross or in installments, as the court may deem just and equitable. As to such property, whether real or personal, as shall have been acquired by the parties jointly during their marriage, whether the title thereto be in either or both of said parties, the court shall make such division between

the parties, respectively, as may appear just and reasonable, by a division of the property in kind, or by setting the same apart to one of the parties, and requiring the other thereof to pay such sum as may be just and proper to effect a fair and just division thereof. * * *"

Everything coming from the husband's separate property is termed alimony in that section, whether property or money. Most of her financial worth at marriage was such part of the $15,000 as was in money, and most of it apparently was, as it was part of the alimony recovered from her first husband. Everything else besides her wedding presents and the stock given her on her wedding day by the defendant's mother, then worth $15,000, worth over $53,000 on the day of the divorce, came to her from the defendant, and even the stock and wedding presents came to her because of the marriage. If there had been any joint accumulation, it was from his efforts alone, and if any of it existed, she had it.

Section 508 [672], supra, in requiring due regard to be had to the value of the husband's property at the time of the divorce, does not mean that what she has shall be disregarded. The section permits the equities full play, and that requirement was evidently to guard against optimistic visions being translated into present overvaluation.

From his book entries, after deducting what she got in the settlement, and figuring the stock at $350 a share, his net worth was $249,000, but the book entries did not reflect proper value. For instance, oil and gas leases carried at $13,500 were, according to the evidence, practically valueless. Business furniture and fixtures and automobiles were carried at $38,789.99, with only $6,695.26 depreciation charged against them, and market value would not even approach that proportion of book value. Also, his books showed $6,625 invested in a signal device, which Mr. Bush said was a total loss, but in rearranging the account by charging out the home and furnishings and figuring stock at $350 a share instead of the figure shown by his books, this entry was not charged off. Further, he was obliged to pay an attorney's fee in the tax matter. He paid $13,500 and suffered judgment for $11,500 more, a total of $25,000, and we would consider half of that, $12,500, a reasonable fee. This indicates a net worth of not more than $215,000, and if we add $8,000 pledged to Princeton University, and

.$1,325 pledged to the Tulsa Community Fund, which he did not pay, it would not fairly exceed $225,000, estimating the stock at $350 a share. In other words, his net worth was $125,000 less than the value of the stock, whatever that value might be. Leaving this tentatively in that condition, let us consider her net worth.

As to her property at the time of the divorce, her attorneys relied upon the old saw, "What's yours is mine, what's mine's my own," and the value of some of her property was not shown. The trial judge said that if he would consider the house alone worth $100,000 he would be allowing a liberal value. In cross-examination of one of his witnesses her attorneys asked if he did not know that property in that vicinity was not worth more than 60 per cent. of its value when the house was built. On that basis it would be worth $99,000, not considering some money spent in shrubbery and in decorating the grounds. That value seems fair.

The stock that his mother gave her was worth nearly $53,500 on the day of the divorce, and she had other stock worth $500, making a total of $54,000.

He alone had given her jewelry costing in excess of $50,000. What jewelry she had before marriage was not shown. She received many valuable silver wedding presents.

The chief controversy was as to the value of the furniture and furnishings. What he alone put into the furnishings exceeded $187,000, as the house cost $165,000, and the total was in excess of $342,000. The mortgage of $70,000 will be given consideration.

We have given the evidence careful consideration. While no great local demand for much of that class of furniture and furnishings appears, they could have been disposed of to advantage and notices probably would have brought to Tulsa many desirous of buying property of that character, without necessitating shipping it to large centers. There was one table which probably could not be duplicated in America. There were many valuable antiques. She, herself, said so. In answer to a question as to depreciation, she said: "Well, a great many of the pieces of furniture are antiques, and I think in valuing antiques, I don't know about the draperies and things of that sort, I dare say deteriorate." True, in another place she said that there were only about five antiques, but that was in answer to Mr. Spillers' objection that many appraisers knew no more about antiques than he knew. While she went both ways on this, she cannot object if we conclude that there were many antiques in the home, especially as the defendant's principal witness so testified, and even her expert admitted that some of the furniture was probably made in the 14th or 15th century, and admitted that the drapes were probably made about the same time. We think that the most satisfactory evidence, and very conservative evidence, came from Mr. Stiles, who made an appraisement which included the linen, but did not include glassware or silverware. His figure was, as he expressed it, $117,500 on a very, very conservative appraisal. He had experience in England and Canada, and years of experience in the United States. Another witness, Mr. Cheiars, who had had 25 years local experience in Tulsa, appraised the furniture and furnishings at $84,000, not including silver, glassware, or linens. For reasons which we will give, we think that his estimate was altogether too low, and that there was considerable value which he did not appreciate.

The plaintiff offered only one witness who even pretended to be an expert. He was a Mr. Faber. He did not appraise any silver or linens. His appraisal was $55,413.50. He called Mr. Spillers before the trial and said that unless an appraisal contract was made, he would accept employment from Mrs. Dresser, which indicates partisanship, and his estimate was based, not upon the value of the items, but upon finding articles that resembled them or in having like articles manufactured. For instance, a table that Mr. Cheiars and Mr. Stiles appraised at $2,000, which Mr. Stiles doubted could be duplicated in America, he would replace by a copy which he might find for about $400, and if he could not find a copy, by one which he would have made for about $250. He did not claim to be an expert on tapestries, but could have the tapestries and the drapes duplicated by the Edgewater Tapestry Mills of New York City, and he admitted that even duplicating the tapestry in that manner would cost from $1,500 to $1,800. He could not identify oriental rugs by examination, and did not know the most valuable make, although he did know the names of the second and third grades. He admitted that six pairs of portiers were made in France in the 14th or 15th century. He admitted that real antiques did

not depreciate in price: "Q. And you would have these antiques reproduced while you were in New York? A. No, I would pick out similar things to the ones which you have. An antique like that has no price. Q. It increases in value as time goes on? A. It depends on how good an antique it is. Q. These are good antiques? A. Yes, sir, two tables are pretty rickety." He appraised a rug in the sun room at $2,500. "What is your idea of what that rug cost? A. Well, I could not tell you that. * * * Q. What is the name of this oriental rug in the sun room? A. I don't know." Now, his appraisal of $55,413.50 did not include books, silver, linen, glassware, china, or crockery; he was partisan; he was manifestly lacking in experience; and his value was based on filling this house, which was full of valuable property and many antiques, with cheap, shoddy, made to order substitutes. Further than that, to accept his figures, we would have to concede that this property of a valuable character which was manifestly carefully selected, only part of which cost the defendant alone more than $185,000, was worth less than one-third that amount. Considering the manifest nature of much of it, and the size of Mr. Faber's appraisal for copies and reproductions of articles that merely looked like those in the home, we would think that his appraisal of what he appraised would not run even 50 per cent. of what it should have run. We think that without considering the value of the silver, china, glassware, or books, she could easily have been successful in netting $100,000 above commissions on the furnishings in the home. This, with the $30,000 equity in the house, would give her $130,000 on the house and that part of the furnishings and furniture in the home, although realizing on the house might be somewhat slow. There was much silver that cost a great deal of money, and the $342,000 included little of that. It is true that some of it was initialed, but that would not render it worthless. We would think that this would easily have had a value of $15,000, even with the market on new silver substantially lower, for with most of it withheld her expert in silver had an appraisal of over $4,500. The jewelry that he paid $50,000 for, we cannot think would have shrunk over 40 per cent., so that she should have realized $30,000 on that. This would all net her around $175,000, not including the $54,000 in stock. She apparently had a realizable financial worth of about $229,000, not considering her debts

and not including the value of much other property which was in the home, such as glassware and chinaware, and not including the books. She testified that when they were married they had many books, and that she had bought many more. Against this there was the note at the bank, on which she owed $27,400. This would have made her net worth something in excess of $200,000. As a matter of fact, her reluctance and her concealment of property from the appraisal, and her failure to produce the appraisal made by the American Appraisal Company convinces us that if we have erred it is in undervaluing rather than in overvaluing. Her husband testified that that appraisement totaled $396,000, and she said that it did not include her linens or her books, for she did not intend to sell the linens or books because these things did not depreciate. So, that appraisal made with the intent of sale must have been quite a recent one, and should have reflected recent values, for in 1925 she had been unwilling to sell the home, and it was about $230,000 in excess of the actual original cost of the house and lots, and was without the linens and books. In figuring that she could net $100,000 we are allowing less than half of that.

Fixing her worth at about $200,000, although realization on the equity in the house may be slow, seems well justified. And she also got the $12,000.

She and her attorney testified that Mr. Dresser expressed the opinion that she held the house, furniture, and furnishings too high, and ought to sell them all for about $125,000. He said that he told her to move out all of the valuable property and then sell the home with some furniture in it for that price, and that seems the more reasonable, in view of what value was there, so they probably misunderstood him.

As opposed to her net worth, his was $125,000 below the value of his stock, and his debts were at least $180,000, being the pledge debt of $79,500, the income tax of $34,000, and an attorney's fee on that, and $50,000 in other debts. Her opinion that the $50,000 included the tax claim is erroneous. The record is plainly and directly to the contrary.

So, leaving out the matter of stock value, there seemed to be about $325,000 difference in their condition, he owing $125,000 and she being worth about $200,000.

If it be true that he lost some money in the oil business, as they asserted, how does

that help her situation? It was his money, and he had diligently endeavored to obtain production and make money in the business. Whatever he may have so lost, it is still true that but for having to maintain her at the rate of $100,000 annually for living expenses, continuing without appreciable reduction to the last, the mortgage on the home of which she complains could well have been paid, and the one-third of the stock sold to his brother would not have had to be sold. Both those matters are properly attributable to her defiant extravagance.

Now, how about this stock value? A mass of evidence to analyze, with no value proven. The $800 to $850 a share for his old stock was largely a paper price, although they did loan him money, for he aided in getting control of all the stock. The stock had no established market value. He was unable to borrow money on it with which to try to get back the stock sold to the brother until the W. A. Harriman deal came up. He was unable to increase the loan at Tulsa on the 1,000 shares above $115,000 and to get to New York on the Harriman deal had to borrow from a friend. In one effort to borrow to get back the stock from the brother somebody said he would loan $500 a share on that stock if he had two weeks to investigate, but for some reason Mr. Atkins gave him only a day, and the loan was not made, nor can we know that it would have been made. Other efforts to borrow for that purpose were unsuccessful. The Harriman deal came about because Mr. Atkins knew Mr. Cushny of that concern and sold him the idea of getting control. Carl Dresser was in debt and had to have money, and at first W. A. Harriman & Co. loaned him $225,000, out of which Mr. Atkins got a commission of $15,000. Later he borrowed $15,000. And in closing up the deal they paid $17,000 on his debts, paid $30,000 to his second wife, whom he married December 13, 1927, about eight months after the divorce, and issued the balance, $555,000 of paper price to her in class A stock, 12,000 shares at $46.25 each. Also, in the original agreement they agreed to loan him up to $400 a share on up to 500 more shares, evidently to permit him to try to get the stock from his brother, in which he was unsuccessful. Also, they took an option on the 1,000 shares at $650 a share, but nothing indicates that they would have exercised it if the deal had not gone through. Nobody got $850, that price to Carl Dresser being largely a paper price, and the others got only a paper price of $700 a share, plus about $38 tax, which would be a paper price of $738,000 for 1,000 shares, which was the number owned by Carl Dresser, if the owner paid the tax from his own money. If we were to adopt either price as a basis to work from, the price to the others would be the better basis, for they did not have to sell, and none of that was for aiding in putting over the deal. The other stockholders took new stock for about all of the price, and it seems that had they not done so, the deal would have not been made, for W. A. Harriman & Co. put as little money in as it had to, and busied itself in getting it out with despatch.

At the end of October, 1928, the 5,000 old shares, with a par value of $100 each, had a book value of more than $445 each. By what they termed the reorganization of capital structure, 200,000 shares were issued, 40 times as many as before, all sharing equally in voting and on liquidation, reducing the book value of a new share to $11.12-1/2. There were 100,000 shares of class A stock, getting a preferential dividend of $3, and 100,000 shares of class B stock, which got the next $1.50 in dividends, and then above that both classes shared equally until they each got an additional $1, and there income on class A stock stopped, however much the company might make. If all the old stockholders had taken stock for the full paper price for the old stock, those owning 4,000 shares would have received 61,500 shares of class A stock at $48 a share, and Carl Dresser would have received 18,379 shares allotted to him at $46.25, getting a discount of $1.75 a share as part of the profits of the selling syndicate. That would all total only 79,878 shares, leaving W. A. Harriman & Co. with the other 20,122 of the 100,000 shares of class A stock, and as the purchaser of all of the old stock, it owned the 100,000 shares of class B stock. Figuring on the basis of 1,000 shares of old stock, which was the number owned by Carl Dresser, an allotment of a paper price of $738,000 at $48 a share would yield 15,375 shares of class A stock, with a book value of $171,046.88, so that W. A. Harriman & Co., for whatever service they rendered, got more than six-tenths of the book value of the assets of the company in the exchange of stock, and each stockholder would give up more than six-tenths of the book value of his old stock and get back less than four-tenths of it. On 1,000 shares W. A. Harriman would have more than $273,953.12 in book value, and the old stockholder would have the $171,046.88, with a gamble as to

how much more his 15,375 new class A shares would bring him in real money.

We cannot conclude that the other stockholders went into the deal intending to keep the new stock as an investment, for if it could be considered that net earnings could be held up to what they were in 1923, when the annual net earnings were $309,917, the earnings on 1,000 old shares would be $61,983.40 or more, whereas the earnings on the 15,375 shares of new class A stock would be between $46,125, if that much was made, and a maximum of $61,500, however much the company might make, both amounts being less than the $61,983.40. And on the basis of the highest earnings shown, those of 1927, $639,930, one-fifth was $127,986, and the new stock would show a shrinkage of from $66.484 to $81,861 annually, depending on whether the new dividends amounted to the $61,500 or were only $46,125. That would surely be giving up something for nothing on going into the deal to get the new stock to hold. Further, we cannot see how they could have expected to get more than the $46,125, if they got that much, dividends at the rate of $3 on the 15,375 shares of new stock allotted for 1,000 old shares. To pay that much would require the company to earn more than $450,000, as it would take $300,000 to pay the $3 dividends on class A stock, and class B stock would take the next $150,000. One owning 1,000 old shares out of net earnings of $450,000 would have an interest of $90,000 for his share, in dividends, or in dividends and surplus. Who would exchange $90,000 for $46,125? Apparently the old stockholders did not go into the deal as an investment, for they would not give away so much for shrinking their incomes, but a consideration of what reasonable men might expect to get for the new class A stock if listed and sold on the stock exchange, and on a very active market, would throw grave doubt on whether annual earnings could be expected to hold up to those of 1923, and on ability to get a high sale value for the old 5,000 shares of stock, even if all offered together, or on its having a very high investment value to one who might have it and be able to keep it.

What would a reasonable man expect to get for his new class A stock on selling it? The evidence does not show. About $48 a share, her attorneys assert. That was what W. A. Harriman & Co. asked for it. It sold some of it, but how much was not shown, and the sales were not on a market. It does not appear that it was listed on the stock exchange, but that company offered it under a prospectus shown in evidence. Delivery of class A stock to the old stockholders was withheld during the life of the selling syndicate, not to exceed 180 days, which had not expired at the date of the trial, and for another 180 days no sales could be made without offering to sell to W. A. Harriman & Co. at the "then prevailing market price." W. A. Harriman & Co. had all that was available. What it had was a thimblerigged, monopolistic "control," and not a "market." We cannot think that men intelligent enough to have held and utilized their stock in the Dresser Manufacturing Company could expect to get a price anything like an approximation to $48 a share. We have disposed of the idea that they at least could have expected it to pay more than the $3 dividend. As a matter of fact 75 cents was the dividend declared prior to the date of the trial in this case, the first quarterly dividend. On $48 a dividend of $3 would be 6-1/4 per cent., and who could expect anybody to pay $48, which was 4-1/3 times a book value of only $11.12½ for a rate of income practically no higher than the rate on gilt-edged investments where return of principal is considered not at all endangered, as well as having income assured? About all we can conclude is that an owner of 1,000 shares of old stock made a trade in which out of book value of more than $445 a share, aggregating more than $445,000, he accepted stock with a book value of only $171,046.88, and bet on how much above that he could get on a sale of the stock. Just how strong his bet was, we do not know, but it does appear that nothing in such conduct on the part of men who did not have to sell or convey their holdings is calculated to induce a belief that a high sale value could have been obtained for the old stock, or that it would be considered as having a high investment value. The evidence certainly did not prove what was claimed, nor what they claim it proved. The others did not have to dispose of their old stock, but Carl Dresser was in a position where he did have to do something, and he was in that position at the time of the divorce.

But here is something tangible. She is asserting a claim against two-thirds of his stock after she has squandered the other one-third, and squandered it defiantly, over his protest, naturally provoking the very sort of conduct which she set up as her cause for divorce. Further than that, she squandered money which she should have used to

pay off the stale mortgage on her home, and she insists on deducting that from her net worth and thereby increasing what she demands out of the two-thirds of the stock after her squandering of the one-third of it. She was not in a condition of want. She was well circumstanced. She had over 13 times the financial worth that she had when she married Dresser, and it was capable of conversion into assets capable of investment to yield her not less than $10,000 annually, if not as much as $12,000, sufficient to support her in any reasonable manner, and to rear and educate her two sons. Comment on her conduct is disagreeable, but it cannot be overlooked that she persisted in this extravagance in the face of knowledge of what would result except in the event that the husband might be fortunate enough to earn money from some unanticipated source and avert the consequences, and what should have been expected did happen. From 1920, only about four years after marriage, she was well warned by exceeding their ability to pay to the extent of $68,723.24, necessitating the making of a mortgage bound to humiliate anybody of a sensitive nature. Next, the stock had to be sold to pay unnecessary debts. Next, there comes an income tax claim; next, the husband has to pledge the 1,000 remaining shares of stock for $79,500, and put it in jeopardy, and above that he owed $50,000 to other creditors. From 1920 the expenditure of as much as $50,000 a year in living expenses would have been extravagant, as in fact it would have been in the light of his worth at any time during the married life. He undoubtedly would have been glad to have the living expenses cut below the $50,000. That would have resulted in paying off the mortgage, and in avoiding the sale of the one-third of his stock. There was persistence in spite of remonstrance. And it was about the time that he had much reason to be greatly provoked that the conduct began of which she complained as ground for divorcing him. Even then she did not drive him away until he could furnish no more money. Her persistence in her utter extravagance in the face of all that was selfish and unfair; unfortunately her conduct was devoid of even common gratitude. If even a most reasonable charge should be made against her for all of this, considering the mortgage as paid, and the bank loan paid, saying nothing about squandering the stock, we would have to consider her worth about $300,000, and then whatever his stock could reasonably be considered to have been worth,

there could be no equity in taking any of it from him and requiring him to turn it to her. She admitted that he was generous, that he was kind-hearted, that he got a "kick" out of buying her jewelry, that he had much affection for her boys, was kind and generous to them, and that even up to within a year of this last trial, which must have been subsequent to the divorce, he got them everything that he could afford. On the other hand, it must be admitted that there was much about her conduct pointing to the marriage as to some extent and quite an extent a marriage of convenience.

So far as concerns the style of living entering into the matter, the past style of living was such that even half of it would have been wildly extravagant in the light of his financial worth at any time, and it was a style to which he not only had objected, but also had, even before the separation preceding the divorce brought them to the point where, had she continued to live with him in dependence on what he might be able to furnish her, and without resort to the property which he had already given her, the new style of living in comparison with the former style would be properly termed a struggle for existence.

She asserts that he was "estopped by the divorce decree to the extent it adjudged she was entitled to alimony in addition to the homestead and household furniture conveyed to her several years before the divorce," and in support of that contention she urges also the following: "Where a right, question, or fact is distinctly put in issue and directly determined by a court of competent jurisdiction in a former suit between the same parties or their privies, the former adjudication of that fact, right, or question is binding on the parties or their privies in a subsequent suit, irrespective of whether the causes of action are the same." She confuses a judgment, which is a final determination of the rights of the parties, with a mere finding or conclusion not followed by judgment. Whether it be contended that there has been a binding adjudication as to a cause of action or defense, or a binding determination of fact or conclusion, there must have been a final determination of the rights of the parties as to the particular cause of action or defense, or, so far as a fact or conclusion is concerned, there must have followed a final adjudication of the rights of the parties to support which such finding or conclusion was a necessary basis. A finding or conclusion not followed by judgment leaves the action uncompleted, and a finding

or conclusion not necessary to a particular final adjudication, where there has been a final adjudication, is not binding in subsequent proceedings. Unfortunately, this binding effect of a finding or conclusion is often termed estoppel by verdict, when as a matter of law the estoppel must be supported by a judgment following it and to support. which the finding or conclusion was necessary. It is unnecessary to review cases holding that a judgment becomes res adjudicata with regard to the identical causes of action or defenses, or with regard to the effect of findings or conclusions necessary to support a judgment actually rendered, as they are not in point, for here there was no judgment.

Her cause of action for money payments in case of divorce was one for a definite money judgment or one denying it. If to grant the divorce or to confirm her prior property rights had necessitated finding that she was entitled to definite future payments, she could urge an estoppel by verdict based on the necessary finding of a fact in support of a judgment actually rendered. But neither the divorce nor the confirmation required finding whether she should have money payments. She can point to no judgment on any other cause of action as res adjudicata as to the facts, nor can she point to any final adjudication as to her asserted cause of action to recover money. In the absence of it, there was at most only a finding, conclusion, or order for judgment, which in subsequent proceedings prior to a dispositive judgment are not res adjudicata. Until such a final judgment the proceedings are in the breast of the court. Her cases holding that a valid judgment is not rendered void by a purported void judgment on an independent matter in excess of jurisdiction, are good authorities, but her error lies in assuming that there was ever an adjudication that she was entitled to any money payments. Holt v. Holt, 23 Okla. 639, at page 669, 102 P. 187, does not support her position, for there the court was careful to point out that the husband admitted that the wife was entitled to all that she had received under the agreement which she repudiated, so that by admission the issues were narrowed to whether she should have more. Cases involving causes of action which merely permit as relief the bare establishment of a writing as the final end are not in point, for they require no more than such a form of judgment as a final disposition of the rights of the parties.

Between the filing of a petition and a final adjudication on the alleged cause of action effectually disposing of the rights of the parties, nothing can be found or concluded which would tie the hands or detract from the power of the court to later find or conclude to the contrary, aside from a few exceptional cases presenting circumstances not present in this case.

She contends that the agreement was in effect one to pay her alimony at $1,000 a month for their joint lives, with an expectancy over 30 years, which would make a total of more than $360,000. It may be that if she had successfully maintained that position in the trial court, the judge would not have gone behind a former approval of the contract, and she could have asked that should the court not agree with her interpretation, she be permitted to recover equitable alimony, for if it was not to be so interpreted it was uncertain. But she did not so proceed. Insisting that not only for alleged fraud, but also that for mere breach, she could rescind, she asked primarily for such alimony as would be equitable, insisting upon that if the court had power to award it, which clearly was an election in the event that she had a choice of remedies, to recover alimony or to recover on the contract. So, she went the other way around; she asked for alimony, and she made a voluminous record in an effort to prove that she should have it and how much she should have, and her contract was subject to an adjudication of the court, upholding it or setting it aside, and since we have concluded that she was entitled to recover nothing, the agreement was manifestly unfair. While the parties may contract with regard to alimony, unless the agreement is fair to both parties, it will not be permitted to stand. He denies that it was an agreement to pay her during their joint lives, and further claims that it was against public policy in not fixing a definite sum as the court is required to do in allowing alimony. If not to be paid during their joint lives, it was at least uncertain. If it required him to pay during their joint lives, it was unfair and unconscionable. His then financial condition would not justify making it or asking him to make it. It was doubtful if he would save his stock, and questionable how much he would save, if anything. We doubt if he appreciated how serious his condition was, notwithstanding his partial appreciation evidenced by his conversation with Mr. Breckenridge. Even then he did not wish to be divorced, and still had much affection

for her. His affection and what must have been decided optimism as to his future condition and prospects, together with her insistence, induced the contract. We observe that while it was finally reduced to writing in his attorney's office, the negotiations were between him and Mr. Breckenridge, which may have been because he had not then employed an attorney. But, however that may be, still it was improvident, inequitable, and unconscionable in the light of the then worth and prospects of the parties. Without regard to the matter of election or rescission heretofore mentioned, that nothing may be asserted under it, we now formally and specifically set it aside and hold it for nothing. Hartl v. Hartl (Iowa) 135 N. W. 1007; Marriage, Divorce, Separation and Domestic Relations, Schouler (6th Ed.), vol. 2, sec. 1815, pp. 1982-3.

The judgment of the trial court is reversed, with instructions to vacate the judgment appealed from and to enter a judgment denying plaintiff alimony, setting aside the agreement to pay alimony and assessing cost against plaintiff.

RILEY, C. J., CULLISON, V. C. J., and BAYLESS, BUSBY, and WELCH, JJ., concur. ANDREWS and OSBORN, JJ., dissent. McNEILL, J., not participating.